IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                            CRIMINAL ACTION NO.  1:22-CR-51

1.    FOTIOS GEAS,
2.    PAUL J. DECOLOGERO, and
3.    SEAN MCKINNON,

        Defendants.

**DEFENDANTS' BRIEF IN
SUPPORT OF MOTION FOR SPECIFIC DISCOVERY**

Defendants Fotios Geas, Paul DeCologero, and Sean McKinnon, through counsel, submit this Brief in Support of Motion for Specific Discovery.

**I.  Background**

All Defendants are charged by Superseding indictment with Conspiracy to Commit First Degree Murder in violation of 18 U.S.C. 1117 [Count One].  Defendants Geas and DeCologero are charged with First Degree Murder in violation of 18 U.S.C. 7(3) and 1111(a) & (b) [Count Two] and Assault Resulting in Serious Bodily Injury in violation of 18 U.S.C. 7(3) and 113(a)(6) [Count Four].  Defendant Geas alone is charged with First Degree Murder by a Federal Prisoner Serving a Life Sentence in violation of 18 U.S.C. 1118(a) [Count Three].  Defendant McKinnon alone is charged with False Statement to a Federal Agent in violation of 18 U.S.C. 1001(a)(2) [Count Five].  All of the charged offenses are alleged to have occurred on October 30, 2018 at the United States Penitentiary-Hazelton (USP-Hazelton). [Doc. 77].

The government has provided initial discovery that mostly relates to the events of

October 30, 2018.  Defendants now seeks additional, specific discovery that is relevant to both culpability for the charged offenses and to sentencing.  These discovery requests are tailored to information that is relevant to the issue of whether the death penalty should be imposed in the event of a conviction.  In the fullness of time additional discovery requests may be submitted to permit the Defendants to effectively defend themselves in both the trial and, if necessary, any penalty phases of this case.

Based on the discovery provided to date, the Superseding Indictment is based on the death of James "Whitey" Bulger on October 30, 2018 at USP-Hazelton.  Bulger and the nature of his criminal conduct was well known to both prison staff and to inmates.  Bulger's crimes and the details of his criminal activity had been widely reported in the mass media, documented in books and depicted in full-length motion pictures and documentaries.  As books have literally been written on the subject, it is impossible in this Brief to adequately summarize the depth of Bulger's depravity.  Bulger was both a serial murderer and a terrifying extortionist while at the same time working surreptitiously as a government informant with corrupt FBI Agents.  The government has described Bulger as follows:

> James "Whitey" Bulger is one of the most violent and despicable criminals in
> Boston history. . . . Bulger has no redeeming qualities. . . . This Court presided
> over a two-month trial which graphically revealed Bulger's sinister nature and his
> truly disturbing disregard for human life.  His crimes caused untold grief to the
> victims' families as well as enormous pain and suffering to the victims
> themselves.  Bulger's horrific crimes and sadistic behavior (e.g., shooting Bucky
> Barrett in the back of the head at close range after hours of interrogation and then
> lying down on the couch to relax as his gang buried Barrett). . . Bulger
> pretend(ed) he was never an FBI informant despite the innumerable meetings he
> had with various FBI agents in which he provided information on his criminal
> competitors. [Government's Sentencing Memorandum, Doc. 1365, U.S. v.
> Bulger, Case No. 99-10371, D.Mass]

All of this is true, yet it barely scratches the surface in describing Bulger's character and conduct.

It is well known that, in prison settings, informants and cooperators are particularly

vulnerable and are frequently targeted for violence.  This fact is so well known that further confirmation is hardly required.  Nevertheless, there is ample evidence that informants in general, and Bulger in particular, are and were vulnerable based on cooperation with the government.  In December of 2022, the Department of Justice Office of Inspector General issued a report regarding its "Investigation and Review of the Federal Bureau of Prisons' Handling of the Transfer of Inmate James "Whitey" Bulger." (hereinafter the "OIG Report")[1]  According to the OIG Report "multiple inmates stated that Bulger was killed because he was a notorious cooperator or informant and/or that everyone knew Bulger would be killed.  Some BOP inmates placed the blame on the BOP.  For example, one inmate stated: 'He was a rat. What would you think would happen to him?' Another inmate stated, 'I heard he was a well known government informant…. Seems he shouldn't have walked the yard. He wouldn't have been ok anywhere.'" (ellipsis in original) OIG Report, p.46.

An inmate who served time with Bulger as USP-Coleman II in Florida described it succinctly.  Bulger "was an FBI informant who allegedly snitched on his competitors.  That's grounds for getting whacked."[2]

Not only was Bulger, in the words of the OIG Report, a "notorious cooperator or informant" it was also widely publicized that he was a sex offender.  Bulger not only killed young women but he also victimized them sexually.  In reporting on Bulger's trial in 2013, media headlines across the country reported that Bulger's former partner in crime, Stephen

---

[1] Department of Justice – Office of the Inspector General, "Investigation and Review of the Federal Bureau of Prisons' Handling of the Transfer of Inmate James 'Whitey' Bulger", December 7, 2022.  Full OIG Report is attached hereto as Exhibit 1 and is also available at https://oig.justice.gov/sites/default/files/reports/23-007_0.pdf.

[2] Nate A. Lindell, "My Memories of Being in Prison with Whitey Bulger", https://www.themarshallproject.org/2016/03/17/my-memories-of-being-in-prison-with-whitey-bulger.

Flemmi, testified that Bulger was a pedophile.  "'You want to talk about pedophilia -- right over there at that table,' Flemmi said, gesturing toward Bulger, seated at the defense table."[3]

Furthermore, Bulger's history as a sexual predator was known to the BOP.  On October 29, 2018, when  Bulger arrived at USP-Hazelton, he was seen by the BOP's Psychology Services.  Psych Services noted that Bulger had "a history of prior sexual abuse perpetration." Despite the facts that Bulger had a documented "history of prior sexual abuse perpetration" and a disciplinary history in the BOP for engaging in sexual acts, he was cleared for placement in general population.   [Discovery Doc. 000034, 36, 87].

It is also well known that, in prison settings, sex offenders are vulnerable and are frequently targeted for violence. Following the death of accused sex offender Jeffrey Epstein inside a federal detention facility, the threats to sex offenders inside prison walls was highlighted.  In a column published in the Miami Herald following Epstein's death, two former prison inmates described the threat of violence that sex offenders face during incarceration. "Because he was convicted of sex crimes against children, Epstein was one of the most likely prison targets.  As former prisoners ourselves, we know violence and abuse in prisons aren't

---

[3] See e.g. Boston Globe,  July 24, 2013, "Flemmi paints Bulger as a pedophile at trial." https://www.bostonglobe.com/metro/2013/07/23/whitey-bulger-took-year-old-girl-mexico-stephen-the-rifleman-flemmi-claims/1Q7IQQBBfVrX7jS3intIPL/story.html?p1=BGSearch_Overlay_Results;  Los Angeles Times, July 23, 2013, "Ex-partner Flemmi testifies Whitey Bulger was a pedophile." https://www.latimes.com/nation/nationnow/la-na-nn-whitey-bulger-flemmi-pedophile-20130723-story.html; New York Post, July 23, 2013, "Bulger's ex-associate Stephen 'The Rifleman' Flemmi accuses former partner of being pedophile." https://nypost.com/2013/07/24/bulgers-ex-associate-stephen-the-rifleman-flemmi-accuses-former-partner-of-being-pedophile/;  Reuters, July 23, 2013, "Henchman accuses Boston mob boss 'Whitey' Bulger of pedophilia." https://www.reuters.com/article/us-usa-crime-bulger/henchman-accuses-boston-mob-boss-whitey-bulger-of-pedophilia-idUSBRE96M0R420130723;  *U.S. v. Bulger*, D.Mass, 99-10371, Doc.1191, p.51.

always the result of supervisory vacuums.  In fact, deaths of people accused of sex offenses are rarely accidental; they're highly choreographed and implicitly endorsed executions."  The Miami Herald column cites statistics of the prevalence of prison violence against sex offenders and notes that "murder is practically approved when it comes to this class of inmates."  Miami Herald, "*Epstein might not have been killed, but sex offenders' prison deaths often are 'choreographed'"* available at https://www.miamiherald.com/opinion/op-ed/article233794677.html.

The threat of violence against sex offenders is not a phenomenon that was only recently discovered.  A 2003 report from ABC News described how "prison can be a menacing place for child molesters."  The ABC report quoted a corrections officer who said "once their crime has become known, they usually don't make it."  ABC News, *Prison is 'Living Hell' for Pedophiles*, available at https://abcnews.go.com/US/prison-living-hell-pedophiles/story?id=90004.

The Bureau of Prisons ("BOP") itself claims to recognize that "sex offenders (are) a vulnerable population within a prison setting."  See BOP Website at https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp.

Because he was well-known as both a government informant and a sexual predator, it was a mystery to exactly nobody that Bulger would be targeted in an open prison setting.  Nevertheless, Bulger was placed in a general population unit.

## II.  Legal discussion

### A.  Discovery law

In *Brady v. Maryland,* 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt *or to punishment* for the offense, irrespective of the good faith

or bad faith of the prosecution."  373 U.S. at 87 (emphasis added).  Indeed, *Brady* was itself a capital case that involved the suppression of favorable evidence related to the capital sentencing determination.  *Id.* at 84-86 (affirming state-court decision remanding for retrial as to penalty only).

Capital defense counsel have a constitutional obligation to investigate and present mitigating evidence:

> Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence.  "As a practical matter, the defendant probably has little or no chance of avoiding the death sentence unless the defense counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant."  Mitigating evidence plays an overwhelmingly important role in the "just imposition of the death penalty."  It "affords an opportunity to humanize and explain-to individualize a defendant outside the constraints of the normal rules of evidence."  In light of its importance, investigation and preparation of a case in mitigation should begin prior to trial, well before any determination of guilt at the first stage.

*Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001)(citations omitted).

In *United States v. Bagley*, 473 U.S. 667, 676 (1985), both the Supreme Court *and the government* recognized the need of the defense to conduct adequate investigation and formulate strategy based on the complete disclosure of favorable material:

> The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist.  In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.
>
> We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner.  And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

473 U.S. at 682-83.

Importantly, the "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant facts." *Dennis v. United States*, 384 U.S. 855, 873 (1966); *see also United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (*Brady* duty extends to searches of files by law enforcement for exculpatory evidence maintained by branches of government aligned with prosecution).

It is well established that *Brady* material includes impeachment material. *Giglio v. United States*, 405 U.S. 150 (1972). Evidence favorable to the defendant includes not only exculpatory evidence but also evidence that the defendant can use to impeach government witnesses. *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021). *See also Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000) (The prosecution should not withhold "evidence that would have allowed defense counsel the means to test [a prosecution witness]'s credibility in the crucible of cross-examination."); *Boss v. Pierce*, 263 F.3d 734, 740 n. 9, 746 (7th Cir. 2001) (granting habeas corpus relief for failure to disclose impeaching information; holding that impeachment evidence is favorable to the defense and rejecting state court "assumption that suppressed evidence must be exculpatory to satisfy the requirements of *Brady*").

In determining the constitutional materiality of potentially favorable information, neither the prosecution nor the Court should employ the backwards-looking *Brady* materiality standard in this pre-trial context. *See United States v. Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) (expressing the view "that the post-trial 'materiality' standard is irrelevant to pretrial and in-trial *Brady* decisions to be made by prosecutors and trial judges" (quoting *United States v. Safavian*, 233 F.R.D. 205, 206-07 (D.D.C. 2006)); *United States v. Acosta*, 357 F. Supp. 2d

1228, 1232 (D. Nev. 2005) ("[T]he government urges *Brady*'s materiality standard is the limit of the duty to disclose.  This court cannot agree. . . *Brady*'s concern whether a constitutional violation occurred after trial is a different question than whether *Brady* is the full extent of the prosecutor's duty to disclose pretrial."); *United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) ("[I]n the pretrial context, the court should require disclosure of favorable evidence under *Brady* and *Giglio* without attempting to analyze its 'materiality' at trial."); *United States v. Seminoff*, 36 F. Supp. 2d 1196, 1198-99 (C.D. Cal. 1999) (determining that *Brady* materiality standard "is only appropriate, and thus applicable, in the context of appellate review").  These decisions are in line with the Supreme Court's decision in *Strickler v. Greene*, 527 U.S. 263 (1999), which distinguished "*Brady* material" from a "*Brady* violation":

> Thus the term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called "*Brady* material" – although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Id.* at 281 (footnote omitted).  At this stage, the Court should hold that the prosecution has an obligation to produce "*Brady* material" regardless of whether a post-trial analysis would determine that a failure to do so was a "*Brady* violation."

As former Judge Kozinski of the Ninth Circuit has discussed, the position that exculpatory information need be provided only if it meets the retrospective materiality analysis runs contrary to the philosophy behind the due-process obligation to produce such information:

> This puts prosecutors in the position of deciding whether tidbits that could be helpful to the defense are significant enough that a reviewing court will find it to be material, which runs contrary to the philosophy of the *Brady/Giglio* line of cases and increases the risk that highly exculpatory evidence will be suppressed. Beyond that, we have what I have described elsewhere as an "epidemic of *Brady* violations abroad in the land," a phrase that has caused much controversy but brought about little change in the way prosecutors operate in the United States.

8

Alex Kozinski, *Criminal Law 2.0,* 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, viii-ix (2015)

(quoting *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013) (Kozinski, J., dissenting from

denial of rehearing en banc)) (footnotes omitted).

 While the Due Process Clause provides a starting point for the government's disclosure

obligations, Federal Rule of Criminal Procedure 16 "is broader than *Brady*."  *United States v.

Baker*, 453 F.3d 419, 424 (7th Cir. 2006); *see also United States v. Caro*, 597 F.3d 608, 620 (4th

Cir. 2010) ("Rule 16 differs from *Brady*, which rests upon due process considerations, and

provides the minimum amount of pretrial discovery granted in criminal cases."); *United States v.

Conder*, 423 F.2d 904, 911 (6th Cir. 1970) ("[T]he disclosure required by Rule 16 is much

broader than that required by the due process standards of *Brady*.").

 The burden of materiality under Rule 16 is "normally is not a heavy burden; rather,

evidence is material as long as there is a strong indication that it will play an important role in

uncovering admissible evidence, aiding witness preparation, corroborating testimony, or

assisting impeachment or rebuttal."  *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)

(internal citation and quotation marks omitted).  "The language and the spirit of [Rule 16] are

designed to provide to a criminal defendant, in the interest of fairness, the widest possible

opportunity to inspect and receive such materials in the possession of the government as may aid

him in presenting his side of the case."  *United States v. Poindexter*, 727 F. Supp. 1470, 1473

(D.D.C. 1989).

 Furthermore, information is material under Rule 16 even if it is not itself admissible.  *See

United States v. Holihan*, 236 F. Supp. 2d 255, 260 (W.D.N.Y. 2002) ("Discovery is material if

the information sought is relevant to the case and will lead to the discovery of admissible

evidence.").  "'Evidence that the government does not intend to use in its case in chief is material

if it could be used to counter the government's case or to bolster a defense.'  The Government

should interpret the language of Rule 16 broadly to ensure fairness to the defendant." *United

States v. Martinez*, 844 F.Supp. 975, 982 (S.D.N.Y. 1994) (quoting *United States v. Stevens*, 985

F.2d 1175, 1180 (2d Cir.1993)).

It is crucial that disclosures be made at a time early enough to allow the defense to

investigate, follow up, and make use of the information in a meaningful manner.  As the Second

Circuit has observed:

> The limited *Brady* material disclosed . . . could have led to specific exculpatory
> information only if the defense undertook further investigation.  When such a
> disclosure is first made on the eve of trial, or when trial is under way, the
> opportunity to use it may be impaired.  The defense may be unable to divert
> resources from other initiatives and obligations that are or may seem more
> pressing.  And the defense may be unable to assimilate the information into its
> case.

*Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001), *cited with approval in United States v.

Knight*, 342 F.3d 697, 709 (7th Cir. 2003).  *See also United States v. Perry*, No. 13cr156, August

1, 2014,  2014 U.S. Dist. LEXIS 112277, at *12, 2014 WL 3955232 (E.D.VA, August 1, 2014)

("the Government is required to make timely disclosure of *Brady* materials in a form that allows

the defense a fair opportunity to effectively utilize such information in preparing for trial.)  Use

of information in a meaningful manner requires production at a time when the defense can utilize

the information to inform myriad pre-trial decisions including issues that may require

independent investigation, retention of necessary expert assistance, legal analysis of potential

defenses and/or mitigation themes, and trial and sentencing phase strategies.

Finally, although the Motion for Discovery makes a number of specific discovery and

*Brady* requests, counsel are mindful of the Supreme Court's admonition that "[a] rule . . .

declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally

bound to accord defendants due process."  *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *see also*

*Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009) ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request.").  In *Long v. Hooks,* 972 F.3d 442, 469 (4th Cir. 2020) the Fourth Circuit discussed and cited with approval  *Banks v. Dretke* and *Douglas v. Workman*.   Further, the Fourth Circuit and Courts within this Circuit acknowledge that the Supreme Court has "jettisoned any requirement that a defendant must request exculpatory evidence in order to be entitled to its disclosure." *United States v. Fisher*, 711 F.3d 460, 471 (4th Cir. 2013)(Agee, J, dissenting), *Stevens v. Chapman*, E.D.VA case no. 20cv352, decided March 30, 2021, 2021 U.S. Dist. LEXIS 61913**,** 2021 WL 1195957, FN9.  By making specific requests, Defendants in no way seek to lessen the affirmative obligation of the prosecution to provide discovery and *Brady* material as required by Rule 16 and the Due Process Clause of the Fifth Amendment, respectively.  The government's duty to provide *Brady* material is not conditioned on the defense requesting or seeking specific evidence as such limitation on *Brady* "would punish the defense for not obtaining evidence it had no reason to believe existed." *See Boss v. Pierce*, 263 F.3d 734, 743 (7th Cir. 2001)

### B.  The legal bases for the discovery requested in this case.

Many of the specific items sought in the Motion for Specific Discovery relate to the conditions and circumstances that led up to the offenses with which the Defendants are charged. Many of the requested items are relevant to the BOP's actions in creating the circumstances that led to Bulger's death.   Additionally, the requested items are potentially relevant to each Defendant's state of mind at the time of the alleged offense.  Accordingly, the requested items may be highly relevant to whether the death penalty should be authorized or imposed.  The Court need not decide admissibility or evidentiary matters at this time to grant this Motion in its entirety.  All the items requested are relevant to the death penalty because they relate to the circumstances of the alleged offense.

The Supreme Court has repeatedly held that the Eighth Amendment "require[s] that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality op.)) (emphasis in original *Lockett* plurality opinion).  The Court has specifically rejected the view that evidence needs to have some nexus to the crime to be mitigating, holding that "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a factfinder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284-285 (2004) (quoting *State v. McKoy*, 372 S.E.2d 12, 45 (N.C. 1988) (Exum, C.J., dissenting)); *see also Ayers v. Belmonte*, 549 U.S. 7, 21 (2006) (describing jury's penalty-phase task as weighing "the finite aggravators against the potentially infinite mitigators"); *Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987) (jury could not be precluded from considering nonstatutory mitigating circumstances); *see generally* 18 U.S.C. § 3592(a) ("finder of fact shall consider *any* mitigating factor . . ." (emphasis added)).  Thus, for example, a capital defendant has a due process right to present mitigating evidence of his positive adjustment to prison.  *Skipper v. South Carolina*, 476 U.S. 1, 10 (1986).  Clearly, the range of evidence that can be considered mitigating at a sentencing hearing is very broad.

Because of the wide range of evidence considered mitigating, the burden to receive discovery relating to mitigation is low:

> In order to receive discovery related to mitigation evidence, the requesting party "need only establish a 'substantial basis for claiming' that a mitigating factor will apply at the penalty phase, in order to invoke the Government's obligation under *Brady* and its progeny to produce any evidence which is material to that mitigating factor."

*United States v. Con-Ui*, No. 3:13-CR-123, 2016 U.S. Dist. LEXIS 1025552016, at *10, WL 4140520 (M.D. Pa. Aug. 4, 2016) (quoting *United States v. Beckford*, 962 F. Supp. 804, 811 (E.D. Va. 1997)).

To be sure, the requests set forth in the Motion for Specific Discovery are numerous and wide-ranging.  But that reflects the extraordinary breadth of the factors relevant to the determination of whether to impose, or seek, the ultimate sentence of death and counsel's duty to make informed and strategic decisions concerning what evidence should be presented after thorough investigation.  *See generally*, *e.g.*, *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016) ("Whether mitigation exists . . . is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not."); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989), regarding the importance of thorough defense investigation). Undersigned counsel are experienced capital defense counsel with specific experience defending BOP homicides.  Counsel are aware that the government either has the information requested, or that such information is readily available to the government on request.

It is important to view each request through the context of this specific case.

Defense counsel are investigating the role that BOP policies, procedures, conduct and/or neglect may have played in the events that led to the charges in this case.  The BOP's participation in creating the circumstances that led to Bulger's death cannot be seriously questioned or debated.  As noted above, the DOJ's Office of Inspector General has investigated the BOP's conduct leading up to Bulger's death and issued a report discussing its findings.  "The OIG's investigation identified serious job performance and management failures at multiple levels within the BOP."  OIG Report, at iii.  More specifically, the OIG found the BOP

13

deficiencies in connection with Bulger's medical designation, his designation and transfer to USP-Hazelton, the widespread knowledge (even among BOP inmates) of Bulger's imminent transfer to USP-Hazelton, and failure to properly consider security concerns ("steps taken by BOP personnel to assess whether Bulger faced harm from other inmates at Hazelton were lacking.") *Id*, at iii-iv).  Notably, the OIG Report specifically affirms that "[t]he OIG has shared the results of its investigation with the U.S. Attorney's Office for the Northern District of West Virginia." *Id*. at iv and 65.

Criticism of the BOP was not limited to the OIG's report.  Long before the OIG Report was released, correctional experts denounced the BOP's conduct as it relates to Bulger's death. For example:

- Cameron Lindsay, a retired warden at three federal facilities, called the case "a shocking failure on multiple levels. There's absolutely no way Bulger should have been sent to Hazelton, and he sure as heck should never have been released to the compound at Hazelton," Lindsay told NBC News.  "It's difficult to imagine how and why so many people dropped the ball on this thing."[4]

- Vito Maraviglia, a retired federal prison special investigative agent, put it in even starker terms.  "Unfortunately, it looks like they gave him the death sentence," said Maraviglia, who spent 27 years monitoring high-risk inmates and evaluating security threats in arriving prisoners.  "And for people to say, I didn't know he'd get hurt there, it's an outright lie. Either they were extremely negligent or just a complete idiot and there had to be 10 idiots because a lot of people signed off on that."[5]

- "What did they think was going to happen?" said Jack Donson, a retired Bureau of Prisons official who spent most of his 23 years at the agency screening inmates set to enter the federal prison in Otisville, New York. "There was a breakdown at every level."[6]

---

[4] NBC News, Nov. 6, 2018, "Ex-prison investigator: Moving Whitey Bulger to violent West Virginia pen a 'death sentence.'"  https://www.nbcnews.com/news/us-news/ex-prison-investigator-moving-whitey-bulger-violent-west-virginia-pen-n931776.
[5] *Id.*
[6] NBC News, September 10, 2022, "Whitey Bulger murder suspect says 'everybody knew he was coming' to their prison."  https://www.nbcnews.com/news/whitey-bulger-murder-suspect-says-everybody-knew-was-coming-prison-rcna47065.

- "They screwed up. I don't know who picked Hazelton — it's one of our most violent institutions," said Joe Rojas, the union president for correctional staff at Coleman, a penitentiary in Sumter County, Florida. Bulger had been incarcerated at Coleman for four years until his transfer to Oklahoma's Federal Transfer Center on Oct. 23 and his subsequent arrival at Hazelton. "That's the last place you want to send a high-profile inmate," Rojas said of Hazelton. "Sending him there is like a death sentence. It's like going on death row," he added.[7]

Elected officials at the highest levels of government were also sounding alarms regarding USP-Hazelton. On October 18, 2018, less than two weeks before Bulger's death, Congresswoman Eleanor Holmes-Norton wrote to the DOJ Inspector General requesting an investigation into "appalling conditions" and rampant violence at USP-Hazelton.[8] On October 25, 2018, mere days before Bulger's death, a bi-partisan group of U.S. Senators and representatives wrote to then Attorney General Sessions expressing concerns about dangerous conditions at BOP facilities including specifically USP-Hazelton.[9]

Counsel have every reasonable expectation that the discovery sought will show a systemic and deliberate indifference to the safety of James Bulger. The government cannot claim ignorance of information suggesting that the BOP generally, and the staff at USP-Hazelton in particular, were aware that Bulger presented safety and security issues. Nor can the prosecution claim that it is not in possession, custody, or control of all the information requested herein. Many of the requests are for information in Department of Justice possession. In this

---

[7] Huffington Post, October 31, 2018, "Prison Where Whitey Bulger Died Is Know As One Of The Most Dangerous In America." https://www.huffpost.com/entry/whitey-bulger-hazelton-prison_n_5bda55c7e4b01abe6a1b257c.

[8] Congresswoman Holmes-Norton Press Release, https://norton.house.gov/media-center/press-releases/norton-demands-ig-investigation-of-appalling-prisoner-conditions.

[9] https://www.manchin.senate.gov/imo/media/doc/102618%20Letter%20to%20Attorney%20General%20Sessions%20re%20BOP%20Staffing.pdf?cb.

case, the BOP has acted hand-in-glove with the prosecution.  The BOP and the FBI investigated this case.  The BOP provided documents and other evidence to the FBI and the prosecution.

Furthermore, the data requested is available to the BOP.  In fact, the BOP has previously produced such data when ordered in other federal capital cases such as *Con-Ui*, *supra*; *United States v. Sablan*, No. 08-cr-0259 (E.D. Cal.); *United States v. Watland*, No. 11-cr-0038 (D. Colo.); *United States v. Richardson*, No. 08-cr-139 (N.D. Ga.); and *United States v. McCluskey*, No. 10-cr-2734 (D.N.M.).

For example, in *United States v. Watland*, a BOP homicide case, the court issued a sweeping order that the government produce nationwide data similar to that requested here. (Exhibit 2, partial transcript *United States v. Watland*, No. 11-cr-0038-JLK (Aug. 9, 2011) (Doc. 167).)  The court in *Watland* summarized the breadth of discovery in cases such as this:

> [W]e are to leave no stone unturned in the discovery process of death penalty cases.  And I can only say in that regard that the Government seeks the death penalty.  That's the Government's right to do so in this case.  But when that happens, it – it sets forth a very – veritable avalanche of information that defense counsel and their experts must have.

(*Id*. at 57.)  The court, therefore, granted the defense discovery motion "in every particular." (*Id*.)  When the government failed to comply with this order, the magistrate judge took the extraordinary step of commanding the government to fully document its compliance with each discovery request and declare under oath that all documents had or had not been produced. If the government represented that documents had been produced, the government was required to provide "a clear, unequivocal statement as to why the government believes that the court should accept that representation."  (Minute Order (Doc. 476), *United States v. Watland*, No. 11-cr-0038-JLK, at 3 (May 16, 2012), attached as Exhibit 3.)

The information the Defendants request herein is relevant to the defense investigation and analysis of prison conditions including the BOP's attention, or lack thereof, to the safety of

inmates.  It will also be useful to rebut any claim that any Defendant would pose a danger to others in the future.  *See Wiggins*, 539 U.S. at 524 ("The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'").

Counsel would be ineffective in failing to fully investigate and demand of the government information that could undermine a future-dangerousness argument.  The Supreme Court has recognized the importance of providing a defendant with the opportunity to rebut future dangerousness arguments:

> Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain."

*Skipper*, 476 U.S. at 5 n.1 (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)); *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994) (due process requires opportunity for defendant to "deny or explain" a showing of future dangerousness).

Similarly, in *United States v. Johnson*, No. 02-cv-06998,  2010 U.S. Dist. LEXIS 133727 (N.D. Ill. December 13, 2010), the court granted habeas relief and vacated a death sentence because defense counsel was ineffective in failing adequately to investigate and challenge prosecution testimony on future dangerousness.  To rebut evidence that the defendant would not be a future danger because of the ability to house him at ADX under the strictest conditions, the government called a former BOP warden as an expert.  *Id*. at *3-4.  This expert gave testimony that the government later admitted was misleading, but defense counsel never challenged him on his inaccurate assertions. *Id*. at *7-8. The court found this failure to be prejudicial: "But the

Court finds that future dangerousness, and the Government's ability to protect against it, is an especially important factor in death penalty cases generally, as well as in this case particularly."

*Id*. at *8.   The court went on to recognize that empirical studies demonstrate the impact of future dangerousness evidence:

> This conclusion also finds support in the empirical research on the subject. A number of studies suggest that future dangerousness is one of the most [significant] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death.  *See, e.g.,* John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?,* 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework,* 18 Law & Hum. Behav. 151, 160 (1994) ("[n]early all jurors [surveyed] ... offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a continuing threat to society").

*Id*. at *9-10.

Here, like in *Johnson*, counsel will be ineffective if they do not adequately prepare to challenge an argument of future dangerousness.

Experience with the modern federal death penalty amply demonstrates that the type of material sought herein - such as that relating to prison conditions and the conduct of prison staff – is mitigation information that can support the imposition of a sentence less than death.  For example, the following mitigating factors were found by capital jurors in BOP homicide cases:

***United States v. William Sablan:***

- "The circumstances that led to Joey Estrella's death existed, at least in part, because of the failure(s) by BOP officials to properly do their job(s)."

- "Prior to Joey Estrella's death, correctional officer Fuller failed to respond to one or more duress alarms from cell 124 despite his duties to the contrary."

- "Prior to Joey Estrella's death, inmate Arthur Peck told correctional officer Forsythe that Rudy Sablan was choking Joe Estrella, but Forsythe did not intervene despite his duties to the contrary."

- "Prior to Joey Estrella's death, inmate Arthur Peck told correctional officer Forsythe that the occupants of cell 124 were fighting, but Forsythe did not intervene despite his duties to the contrary."

- "Prior to Joey Estrella's death, correctional officers were aware that the occupants of cell 124 were drinking hooch, but did not intervene despite their duties to the contrary."

- "Upon William Sablan's arrival at the United States Penitentiary-Florence, the BOP failed to conduct a psychological/medication evaluation despite the fact that his transfer papers indicated mental concerns and recommended that BOP officials 'review *PSY/MED* on arrival'."[10]

### *United States v. Rudy Sablan:*

- "Upon William Sablan's arrival at the United States Penitentiary-Florence, the Bureau of Prisons ("BOP") placed him in cell 124, the Special Housing Unit, along with Rudy Sablan and Joey Estrella, despite the fact that the cell was designed to house only 2 people."

- "The circumstances that led to Joey Estrella's death existed, at least in part, because of the failure(s) by BOP officials to properly do their job(s), by allowing alcohol and weapons in the cell."

- "The BOP, [*sic*] didn't do their job by faulty logic of putting William and Rudy in the same cell."

- "Joey died because the guards failed to do 30-minute rounds."[11]

### *United States v. Barry Byron Mills:*

- "Daily life for inmates in a federal penitentiary is dangerous and violent."[12]

### *United States v. Brian Richardson:*

- "Brian Richardson's experiences in prison and his exposure to the convict code and prison culture of various prisons explains, in part, his fatal attack on Steven Obara."

- "The circumstances that led to Steven Obara's death existed, at least in part, because BOP officials put Brian Richardson and Mr. Obara in the same cell when they should not have been housed together."

---

[10]   Verdict form attached hereto as Exhibit 4.
[11]   Verdict form attached hereto as Exhibit 5.
[12]   Verdict form attached hereto as Exhibit 6.

- "If sentenced to life in federal prison without release, Brian Richardson will be sent to ADX where he will live in solitary confinement with limited human contact."[13]

### United States v. Michael O'Driscoll:

- "The Federal Bureau of Prisons is capable of fashioning conditions of confinement that will isolate and punish Mr. O'Driscoll for the murder of Robert Frankhouser."[14]

### United States v. Jessie Con-Ui:

- "The Arizona Corrections system was so dangerous and out of control at the time Jessie Con-Ui entered it that a federal court found it could not ensure the safety of its prisoners."

- "During the years Jessie Con-Ui was there, the Arizona prison system was poorly administered."

- "During the years Jessie Con-Ui was there, the Arizona prison system did not provide rehabilitative services."

- "Jessie Con-Ui's experiences in the Arizona prison system changed him for the worse." [15]

In light of these verdict forms, the current standard of practice in BOP homicide cases, and the authorities cited herein, defense counsel would risk being constitutionally ineffective if they did not obtain, and make good use of, the type of information and materials sought by the specific requests set forth in the Motion for Specific Discovery.

WHEREFORE, for the aforementioned reasons and for any other reasons which may appear to this Honorable Court, Defendants respectfully asks the Court to enter an order requiring the government to provide the defense with the specific items of discovery and *Brady* material and information requested in the Defendants' Motion for Specific Discovery filed concomitantly herewith.

---

[13]   Verdict form attached hereto as Exhibit 7.
[14]   Verdict form attached hereto as Exhibit 8.
[15]   Verdict form attached hereto as Exhibit 9.

Respectfully submitted April 27, 2023.

/s/Nathan D. Chambers                          /s/ Patrick F. Nash
Nathan D. Chambers                             Patrick F. Nash
Nathan D. Chambers, LLC                        Nash ▪ Marshall, PLLC
303 16th Street, Suite 200                     129 West Short Street
Denver, Colorado  80202                        Lexington, Kentucky 40507
(303) 825-2222                                 (859) 254-3232
nchambers@nathanchamberslaw.com                pfnash@nashmarshall.com
Attorney for Defendant Geas                    Attorney for Defendant DeCologero

/s/ Katy Cimino
Katy Cimino
Assistant Federal Public Defender
230 West Pike Street, Suite 360
Clarksburg, WV  26301
304-622-3823
Katy_Cimino@fd.org
Attorney for Defendant McKinnon

CERTIFICATE OF SERVICE

       I hereby certify that on April 27, 2023, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

                          By:   s/Nathan D. Chambers
                          Nathan D. Chambers
                          303 16th Street, Suite 200
                          Denver, Colorado  80202
                          (303) 825-2222
                          Attorney for Defendant, Fotios Geas